**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| CINTAS CORPORATION, | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | Case No: 2:20-cv-160 |
| | ) | |
| v. | ) | |
| | ) | |
| JUPITER ALUMINUM CORPORATION, | ) | |
| | ) | |
| Defendant/Counter-Plaintiff. | ) | |

**CINTAS CORPORATION'S ANSWER TO COUNTERCLAIM AND**
**COUNTERCLAIM TO COUNTERCLAIM**

The Plaintiff/Counter-Defendant, Cintas Corporation, by their counsel, Eichhorn & Eichhorn, LLP, for its answer to counterclaim and counterclaim to counterclaim of Defendant/Counter-Plaintiff, Jupiter Aluminum Corporation, states as follows:

**ANSWER TO COUNTERCLAIM**

1.      Jupiter Aluminum Corporation ("Jupiter") operates aluminum mills in Hammond, Indiana; Fairland, Indiana; and Beech Bottom, West Virginia. Over the years, Jupiter has rented uniforms and other services from Cintas Corporation ("Cintas") for use by its employees in its mills. At times, Jupiter has rented uniforms and other services from Cintas pursuant to a service agreement, while at other times, no service agreement has been in effect and Jupiter has paid Cintas for service pursuant to the terms of regular invoices.

> **ANSWER:**    **Cintas admits that Jupiter operates mills in Hammond, Indiana and Beech Bottom, West Virginia but is without sufficient information to admit or deny whether it operates a mill in Fairland, Indiana.  Cintas further admits that Jupiter has rented uniforms and other services from Cintas pursuant to a service agreement but denies the remaining allegations of paragraph 1 of Jupiter's counterclaim.**

1

2.      In late 2019, after conducting an audit of Cintas' invoices issued to Jupiter's
Hammond plant for uniform rental services, Jupiter discovered that Cintas had engaged in a years-
long scheme to overcharge Jupiter for uniform rental and cleaning services. This scheme included
charging Jupiter for more uniforms than Cintas actually delivered to Jupiter and charging Jupiter
more to clean and service each uniform than the parties had agreed upon.

**ANSWER:      Cintas denies the allegations of paragraph 2 of Jupiter's counterclaim.**

3.      When Jupiter discovered Cintas' overcharging scheme, Jupiter terminated its Flame
Resistant Garment Service Agreement for Hammond, rejected Cintas' invoices issued between
August 2019 and November 2019 (which had not been paid pending the audit), demanded
paperwork to justify Cintas' charges since the Hammond relationship began in 2008, and
demanded a refund from Cintas of several hundred thousand dollars (to be fully determined) upon
receipt of Cintas' complete paperwork. Jupiter also terminated its Standard Rental Service
Agreement for Beech Bottom, with cause. Cintas ignored Jupiter's demands for paperwork and a
refund, and instead filed a lawsuit, claiming that Jupiter owes it money.

**ANSWER:      Cintas admits that Jupiter terminated its Flame Resistant Garment
Services Agreement for Hammond and that it failed and refused to pay
invoices between August 2019 and November 2019. Cintas denies that
Jupiter demanded a refund during this time or that it ignored Jupiter's
demands for paperwork.  Cintas admits that Jupiter terminated its
Standard Rental Service Agreement for Beech Bottom but denies that
it did so with cause. Cintas denies that remaining allegations of
paragraph 3 of Jupiter's counterclaim.**

4.      Cintas' issuance of fraudulent invoices, at least dating from 2014 through 2019, but
likely dating farther back, upon which Jupiter just discovered and reasonably relied to its detriment
by paying for goods and services which were not delivered, has caused damage to Jupiter in excess
of $500,000. Cintas' conduct has further breached its agreement to provide Jupiter with the agreed

2

upon services at the agreed upon price, damaging Jupiter. Finally, Jupiter brings this action requesting a declaration that its service agreements with Cintas at its Hammond and Beech Bottom plants are terminated and that Jupiter has no further obligations thereunder.

> **ANSWER:**   **Cintas denies the allegations of paragraph 4 of Jupiter's counterclaim.**

5.     Jupiter Aluminum Corporation is an Illinois corporation with its principal place of business located in Des Plaines, Illinois. Jupiter is a citizen of Illinois.

> **ANSWER:**   **Cintas is without sufficient information to admit or deny the allegations of paragraph 5 of Jupiter's counterclaim.**

6.     Cintas Corporation is a Nevada corporation with its principal place of business located in Cincinnati, Ohio. Cintas is a citizen of Nevada and Ohio.

> **ANSWER:**   **Cintas admits the allegations of paragraph 6 of Jupiter's counterclaim.**

7.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the parties are citizens of different states.

> **ANSWER:**   **Cintas is without sufficient information to admit or deny the allegations of paragraph 7 of Jupiter's counterclaim.**

8.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District and Division.

> **ANSWER:**   **Cintas admits venue is proper as to Jupiter's counterclaims addressing the Hammond Agreement but otherwise denies the allegations of paragraph 8 of Jupiter's counterclaim.**

9.     Jupiter Aluminum Corporation is an aluminum mill operator that recycles aluminum scrap and rolls the aluminum into coils to be used in building, construction, agricultural, automotive and distribution industries. These coils are either directly sold as mill finish or painted at Jupiter's paint lines before shipping to customers.

> **ANSWER:**   **Cintas admits that Jupiter operates an aluminum mill but is without sufficient information to admit or deny the remaining allegations of paragraph 9 of Jupiter's counterclaim.**

10.    Jupiter operates an aluminum recycling facility in Hammond, Indiana (the "Hammond Plant").

> **ANSWER:**   **Cintas admits the allegations of paragraph 10 of Jupiter's counterclaim.**

11.    Jupiter operates a paint line in Fairland, Indiana.

> **ANSWER:**   **Cintas is without sufficient information to admit or deny the allegations of paragraph 11 of Jupiter's counterclaim.**

12.    Jupiter operates a paint line in Beech Bottom, West Virginia (the "Beech Bottom Plant").

> **ANSWER:**   **Cintas admits that Jupiter operates the Beech Bottom Plant in West Virginia but is without sufficient information to admit or deny the remaining allegations of paragraph 12 of Jupiter's counterclaim.**

13.    On or about February 4, 2008, Jupiter entered into a Flame Resistant Garment Service Agreement with Cintas Corporation for the provision of uniforms and related services at the Hammond Plant (the "Hammond Agreement"). The Hammond Agreement is attached as Exhibit 1.

> **ANSWER:**   **Cintas admits the allegations of paragraph 13 of Jupiter's counterclaim.**

14.    The Hammond Agreement is a form contract created by Cintas with blank spaces to complete the specific details of each specific customer agreement.

> **ANSWER:    Cintas admits the allegations of paragraph 14 of Jupiter's counterclaim.**

15.    The Hammond Agreement does not contain any statement that it was negotiated or drafted by all parties or their representatives.

> **ANSWER:    Cintas admits the allegations of paragraph 15 of Jupiter's counterclaim.**

16.    The Hammond Agreement does not contain any statement that the parties were represented by legal counsel in negotiations.

> **ANSWER:    Cintas admits the allegations of paragraph 16 of Jupiter's counterclaim.**

17.    While Cintas states in the Hammond Agreement that flame resistant garments are "not standard to the Company's normal rental product line," Cintas nonetheless has and/or had a standard form contract for such garment services.

> **ANSWER:    Cintas admits that the Hammond Agreement states, in part, that the flame resistant garments rented by Jupiter were not standard to the company's normal rental product line and that it has a form contract for non-standard product lines.**

18.    Cintas represented to Jupiter that it is the largest provider of flame resistant uniforms in the industry.

> **ANSWER:    Cintas admits that it has stated, but not in the Hammond Agreement, that it is the largest provider of flame resistant uniforms in the industry but is without sufficient information to admit or deny the remaining allegations of paragraph 18 of Jupiter's counterclaim.**

19.     Cintas represents to the public that it "is the largest provider of managed flame resistance clothing (FRC) programs."

**ANSWER:**     **Cintas admits that its website includes a statement that it is the largest provider of managed flame resistance clothing (FRC) programs but is without sufficient information to admit or deny the remaining allegations of paragraph 19 of Jupiter's counterclaim.**

20.     Cintas represents to the public that it operates nearly 500 facilities in North America and "leads the industry in supplying corporate identity uniform programs . . . first aid, safety, [and] fire protection products and services…"

**ANSWER:**     **Cintas admits that its website includes a statement, a portion of which is set forth in paragraph 20 of Jupiter's counterclaim, but is without sufficient information to admit or deny the remaining allegations of paragraph 20 of Jupiter's counterclaim.**

21.     Pursuant to the Hammond Agreement, Cintas agreed to rent eleven (11) Vinex flame resistant pants and jackets for Jupiter's employees to use at the Hammond Plant, such that each employee would have 11 sets of suits.

**ANSWER:**     **Cintas admits that the Hammond Agreement provided, in part, that it would rent eleven (11) Vinex flame resistant pants and jackets for each employee to Jupiter for its use at the Hammond Plant but denies the remaining allegations of paragraph 21 of Jupiter's counterclaim.**

22.     In addition to the eleven (11) Vinex flame resistant suits, pursuant to the Hammond Agreement, Cintas agreed to rent five (5) changes of Vinex suits and six (6) changes of "stock" suits.

**ANSWER:**     **Cintas admits that the Hammond Agreement provided, in part, that it would rent eleven (11) Vinex flame resistant pants and jackets (which would allow for five changes) and six stock pants and jackets but denies the remaining allegations of paragraph 22 of Jupiter's counterclaim.**

23.     Pursuant to the Hammond Agreement, Cintas agreed to launder and service the flame resistant pants and jackets, store extras while not in use, and replace any garments due to normal wear and tear.

**ANSWER:     Cintas admits that the Hammond Agreement provided, in part, that "all garments will be cleaned and maintained" by Cintas and that "[a]ny garments that require replacement due to normal wear will be replaced" by Cintas but denies the remaining allegations of paragraph 23 of Jupiter's counterclaim.**

24.     Pursuant to the Hammond Agreement, Jupiter did not request that the flame resistant suits be affixed or embroidered with the company's emblem.

**ANSWER:     Cintas admits the allegations of paragraph 24 of Jupiter's counterclaim.**

25.     Pursuant to the Hammond Agreement, when employees left the employ of Jupiter, their rental garments would be returned to Cintas and the weekly rental charge for that individual would be terminated.

**ANSWER:     Cintas admits that the Hammond Agreement provided, in part, that the weekly rental charge for any individual leaving the employ of Jupiter can be terminated, but only after all garments issued to that individual, or the value of same had been returned to Cintas.  Cintas denies the remaining allegations of paragraph 25 of Jupiter's counterclaim.**

26.     Pursuant to the Hammond Agreement, when Jupiter hired new employees, Cintas would provide them a new set of rental garments.

**ANSWER:     Cintas admits that the Hammond Agreement provided, in part, that additional Jupiter employees, products and services may be added to the Hammond Agreement and shall automatically become part of and subject to the terms of the Hammond Agreement but otherwise denies the remaining allegations of paragraph 26 of Jupiter's counterclaim.**

27.     Pursuant to the Hammond Agreement, "All garments and other rented items remain the property of [Cintas]."

> **ANSWER:   Cintas admits the allegations of paragraph 27 of Jupiter's counterclaim.**

28.     Pursuant to the Hammond Agreement, "Upon each anniversary date of this agreement, [Cintas] will automatically increase the prices then in effect by the amount of the increase in the Consumer Price Index for the previous twelve months or 5%."

> **ANSWER:   Cintas admits that the Hammond Agreement provided, in part, that upon each anniversary date of this agreement, Cintas will automatically increase the prices then in effect by the amount of the increase in the Consumer Price Index for the previous twelve months or 5% but denies the remaining allegations of paragraph 28 of Jupiter's counterclaim.**

29.     The Hammond Agreement provides that is can be terminated by Jupiter in writing more than 180 days in advance of the then current 60 month term.

> **ANSWER:   Cintas admits that the Hammond Agreement provides, in part, that the Hammond Agreement will automatically renew for the same period of time unless Cintas was notified, to the contrary, in writing 180 days in advance of the expiration of the then current term, but denies the remaining allegations of paragraph 29 of Jupiter's counterclaim.**

30.     The Hammond Agreement states: "If Customer cancels this agreement prior to the applicable expiration date for any other reason…Customer will pay to [Cintas], as liquidated damages and not as a penalty, the greater of the average weekly invoice total multiplied by the number of weeks remaining in the unexpired term or buy back all garments allocated to customer at the then current replacement values." (the "Hammond Termination Fee").

> **ANSWER:   Cintas admits a portion of the Hammond Agreement provides, in part, that if Jupiter cancels this agreement prior to the applicable expiration date for any other reason, Jupiter will pay to Cintas as liquidated**

**damages and not as a penalty, the greater of the average weekly invoice total multiplied by the number of weeks remaining in the unexpired term or buy back all garments allocated to Jupiter at the then current replacement values but denies the remaining allegations of paragraph 30 of Jupiter's counterclaim.**

31.　The Hammond Termination Fee is an unenforceable penalty.

**ANSWER:** **Cintas denies the allegations of paragraph 31 of Jupiter's counterclaim.**

32.　On or about September 26, 2013, Jupiter entered into a Standard Rental Service Agreement with Cintas Corporation for the provision of uniforms and related services at the Beech Bottom Plant (the "Beech Bottom Agreement"). The Beech Bottom Agreement is attached as Exhibit 2.

**ANSWER:** **Cintas admits the allegations of paragraph 32 of Jupiter's counterclaim.**

33.　The Beech Bottom Agreement is a form contract created by Cintas with blank spaces to complete the specific details of each specific customer agreement.

**ANSWER:** **Cintas admits the allegations of paragraph 33 of Jupiter's counterclaim.**

34.　The Beech Bottom Agreement does not contain any statement that it was negotiated or drafted by all parties or their representatives.

**ANSWER:** **Cintas admits the allegations of paragraph 34 of Jupiter's counterclaim.**

35.　The Beech Bottom Agreement does not contain any statement that the parties were represented by legal counsel in negotiations.

**ANSWER:** **Cintas admits the allegations of paragraph 35 of Jupiter's counterclaim.**

9

36.     Pursuant to the Beech Bottom Agreement, Cintas agreed to rent standard uniforms for Jupiter's employees to use at the Beech Bottom Plant.

> **ANSWER:**   **Cintas admits that it agreed to rent certain uniforms and other things as reflected in the Beech Bottom Agreement, but denies the remaining allegations of paragraph 36 of Jupiter's counterclaim.**

37.     Pursuant to the Beech Bottom Agreement, Cintas agreed to launder and service the standard pants and shirts, store extras while not in use, and replace any garments due to normal wear and tear.

> **ANSWER:**   **Cintas admits that the Beech Bottom Agreement provided, in part, that "all garments will be cleaned and maintained" by Cintas and that "[a]ny garments that require replacement due to normal wear will be replaced" by Cintas but denies the remaining allegations of paragraph 37 of Jupiter's counterclaim.**

38.     Pursuant to the Beech Bottom Agreement, when employees left the employ of Jupiter, their rental garments would be returned to Cintas and the weekly rental charge for that individual would be terminated.

> **ANSWER:**   **Cintas admits that the Beech Bottom Agreement provided, in part, that the weekly rental charge for any individual leaving the employ of Jupiter could be terminated, but only after all garments issued to that individual, or the value of same had been returned to Cintas.  Cintas denies the remaining allegations of paragraph 38 of Jupiter's counterclaim.**

39.     Pursuant to the Beech Bottom Agreement, when Jupiter hired new employees, Cintas would provide them a new set of rental garments.

> **ANSWER:**   **Cintas admits that the Beech Bottom Agreement provided, in part, that additional Jupiter employees, products and services could be added to the Beech Bottom Agreement and would automatically become part of and subject to the terms of the Beech Bottom Agreement but otherwise denies the allegations of paragraph 39 of Jupiter's counterclaim.**

40.     Pursuant to the Beech Bottom Agreement, "All garments and other rented items …

remain the property of [Cintas]."

>    **ANSWER:**     **Cintas admits that the Beech Bottom Agreement provided, in part, that all garments and other rented items remained the property of Cintas but denies the remaining allegations of paragraph 40 of Jupiter's counterclaim.**

41.     The Beech Bottom Agreement does not state that the uniforms Jupiter agreed to

rent from Cintas were non-standard, unique or otherwise specific for Jupiter's use.

>    **ANSWER:**     **Cintas admits that the Beech Bottom Agreement does not expressly state the uniforms were "non-standard, unique or otherwise specific" but denies the remaining allegations of paragraph 41 of Jupiter's counterclaim.**

42.     The Beech Bottom Agreement states that the initial term is sixty (60) months, and

the agreement automatically renews for the same period unless Cintas is notified in writing, 60

days in advance of the expiration of the then current term.

>    **ANSWER:**     **Cintas admits that the Beech Bottom Agreement provided, in part, that it was effective as of the date of execution for a term of 60 months from date of installation and that the Beech Bottom Agreement automatically renewed for the same period of time unless Cintas was notified, to the contrary, in writing, 60 days in advance of the expiration of the then current term but denies the remaining allegations of paragraph 42 of Jupiter's counterclaim.**

43.     The Beech Bottom Agreement states that if it is terminated by the customer prior

to the applicable expiration date for any reason other than documented quality of service reasons,

"Customer will pay to [Cintas], as liquidated damages and not as a penalty, the greater of 50% of

the average weekly invoice total multiplied by the number of weeks remaining in the unexpired

term, or buy back all garments and other products allocated to Customer at the then current

replacement values." (the "Beech Bottom Termination Fee").

11

> **ANSWER:** **Cintas admits that the Beech Bottom Agreement provided, in part, that if the agreement was terminated by Jupiter prior to the applicable expiration date for any reason other than documented quality of service reasons which are not cured as set forth above, or terminated by Cintas for cause at any time, Jupiter will pay to Cintas, as liquidated damages and not as a penalty, the greater of 50% of the average weekly invoice total multiplied by the number of weeks remaining in the unexpired term, or buy back all garments and other products allocated to Jupiter at the then current replacement values but denies the remaining allegations of paragraph 43 of Jupiter's counterclaim.**

44.     The Beech Bottom Termination Fee is an unenforceable penalty.

> **ANSWER:** **Cintas denies the allegations of paragraph 44 of Jupiter's counterclaim.**

45.     The Hammond Agreement, executed on February 4, 2008, renewed by its own terms for an additional sixty (60) months on February 4, 2013. By those terms, the Hammond Agreement renewed again on February 4, 2018, for a term ending on February 4, 2023.

> **ANSWER:** **Cintas admits that the Hammond Agreement executed on February 4, 2008, renewed by its own terms for an additional sixty (60) months on February 4, 2013 and that by those terms, the Hammond Agreement renewed again on February 4, 2018 for a term ending on February 4, 2023.**

46.     Pursuant to the Hammond Agreement, when Jupiter hired and terminated employees, Jupiter informed Cintas so that new uniforms could be rented for new employees and uniforms of terminated employees could be returned.

> **ANSWER:** **Cintas admits that pursuant to the Hammond Agreement, Jupiter could inform Cintas when it hired and terminated employees so that new uniforms could be rented for new employees and uniforms of terminated employees could be returned but is without sufficient information to admit or deny whether Jupiter did so and therefore, denies the remaining allegations of paragraph 46 of Jupiter's counterclaim.**

47.     Jupiter regularly returned the rented uniforms of terminated employees.

**ANSWER:** **Cintas admits that Jupiter returned some rented uniforms of some terminated employees but is without sufficient information to admit or deny whether Jupiter did so regularly and therefore, denies the remaining allegations of paragraph 47 of Jupiter's counterclaim.**

48.     Jupiter relied upon Cintas to regularly update its inventory system to reflect the new employees that had been hired and the old employees who had been terminated.

**ANSWER:** **Cintas is without sufficient information to admit or deny whether Jupiter relied upon Cintas to regularly update its inventory system to reflect the new employees that had been hired and the old employees who had been terminated and therefore, denies the allegations of paragraph 48 of Jupiter's counterclaim.**

49.     Jupiter relied upon Cintas to regularly update its inventory system to ensure that Cintas only charged Jupiter for the actual number of uniform sets that Jupiter was renting at that time.

**ANSWER:** **Cintas is without sufficient information to admit or deny whether Jupiter relied upon Cintas to regularly update its inventory system to ensure that Cintas only charged Jupiter for the actual number of uniform sets that Jupiter was renting at that time and therefore, denies the allegations of paragraph 49 of Jupiter's counterclaim.**

50.     Pursuant to the Hammond Agreement, Cintas agreed to launder and store extra uniform sets, such that Jupiter paid for uniform sets located at both the Hammond Plant for its employees to use and extras in laundry, storage and/or repair at Cintas' facility.

**ANSWER:** **Cintas admits that it agreed to clean and maintain all garments as reflected in the Hammond Agreement but denies the remaining allegations of paragraph 50 of Jupiter's counterclaim.**

13

51.     Over the years, if a rented uniform needed to be replaced, the Hammond Agreement required Cintas to replace the old uniform with a new uniform, and add that new uniform to the complete set of uniforms for each Jupiter employee, while removing the old uniform from the inventory system and weekly charges.

**ANSWER:**     **Cintas admits that it agreed to replace any garments that required replacement due to normal wear as reflected in the Hammond Agreement but denies the remaining allegations of paragraph 51 of Jupiter's counterclaim.**

52.     Over the years, Cintas failed to regularly update its inventory system and continued to charge Jupiter for weekly fees to rent uniforms for terminated employees.

**ANSWER:**     **Cintas denies the allegations of paragraph 52 of Jupiter's counterclaim.**

53.     Over the years, Cintas categorized uniforms as "lost," charging Jupiter for a replacement uniform when the uniform was not lost.

**ANSWER:**     **Cintas admits that it charged Jupiter for lost uniforms but denies the remaining allegations of paragraph 53 of Jupiter's counterclaim.**

54.     Over the years, Cintas failed to ensure that the number of uniform sets per employee it maintained for Jupiter conformed to the terms of the Hammond Agreement.

**ANSWER:**     **Cintas denies the allegations of paragraph 54 of Jupiter's counterclaim.**

55.     Over the years, Cintas charged Jupiter for more uniform sets per employee than Jupiter had agreed to rent pursuant to the Hammond Agreement.

**ANSWER:**     **Cintas denies the allegations of paragraph 55 of Jupiter's counterclaim.**

14

56.     Over the years, Cintas committed gross negligence in its provision of flame resistant uniforms to Jupiter, including but not limited to, placing non-flame resistant uniforms in Jupiter's employees' lockers, returning burned and hole-ridden uniforms to employees' lockers, poor integrity of uniforms, and lack of proper inspection, repair and replacement of uniforms.

**ANSWER:**     **Cintas denies the allegations of paragraph 56 of Jupiter's counterclaim.**

57.     Over the years, Cintas failed to ensure Jupiter's employees has a sufficient number of clean and usable uniforms on site to use.

**ANSWER:**     **Cintas denies the allegations of paragraph 57 of Jupiter's counterclaim.**

58.     Pursuant to the Hammond Agreement, over the years, from 2008 through 2019, Cintas was responsible for annually increasing rental service prices and applying agreed upon increased rental service prices to weekly invoices issued to Jupiter.

**ANSWER:**     **Cintas admits that pursuant to the Hammond Agreement, it could annually increase rental service prices as reflected in the Hammond Agreement but denies the remaining allegations of paragraph 58 of Jupiter's counterclaim.**

59.     Pursuant to the Hammond Agreement, rental prices would increase each anniversary date "by the amount of the increase in the Consumer Price Index for the previous twelve months or 5%."

**ANSWER:**     **Cintas admits that the Hammond Agreement provided that prices would automatically increase each anniversary date by the amount of the increase in the Consumer Price Index for the previous twelve months or 5% but denies the remaining allegations of paragraph 59 of Jupiter's counterclaim.**

60.     Jupiter relied upon Cintas to properly calculate the amount of the annual price increase pursuant to the terms of the Hammond Agreement.

**ANSWER:**     **Cintas denies the allegations of paragraph 60 of Jupiter's counterclaim.**

61.     Jupiter relied upon Cintas to issue true and correct invoices on a weekly basis for goods provided and services rendered.

> **ANSWER:**     **Cintas is without sufficient information to admit or deny the allegation in paragraph 61 of Jupiter's counterclaim and therefore, denies the allegations of paragraph 61 of Jupiter's counterclaim.**

62.     In or around October 2019, Jupiter discovered irregularities in the weekly invoices it received from Cintas.

> **ANSWER:**     **Cintas denies the allegations of paragraph 62 of Jupiter's counterclaim.**

63.     In or around October 2019, Jupiter discovered that Cintas had been overcharging Jupiter for rental services far in excess of the prices agreed upon in the Hammond Agreement, and began an audit of its current and past invoices.

> **ANSWER:**     **Cintas denies the allegations of paragraph 63 of Jupiter's counterclaim.**

64.     After discovering Cintas' overcharging scheme, on or about October 21, 2019, Jupiter terminated the Hammond Agreement for cause.

> **ANSWER:**     **Cintas denies the allegations of paragraph 64 of Jupiter's counterclaim.**

65.     On or about October 22, 2019, Cintas demanded that Jupiter "buy back" all non-standard apparel from Cintas for $672,974.30. Cintas demanded that same "buy back" price, also known as the "current replacement value" or "new price" for each jacket and each pant, regardless of its age or wear.

> **ANSWER:**     **Cintas admits that on or about October 22, 2019, Cintas delivered correspondence to Jupiter that stated in part, that Jupiter was "obligated per paragraph 9 to buy back all non-standard apparel from**

**Cintas purchased on your behalf at current replacement values.  The estimated total buy back amount is $672,974.30" but denies the remaining allegations of paragraph 65 of Jupiter's counterclaim.**

66.    Jupiter objected to Cintas' demand, and requested that Cintas provide an itemized listing of all uniforms Cintas wanted Jupiter to "buy back" and the purchase date of each item.

> **ANSWER:    Cintas admits that Jupiter requested by email a breakdown between new vs. used for the uniform inventory sent on October 23, 2019 but denies the remaining allegations of paragraph 66 of Jupiter's counterclaim.**

67.    Jupiter is aware that the "purchase date" of each garment, or at least the "activation date" when the employee began wearing a uniform set, is readily available to Cintas because Cintas had previously provided such information on certain occasions to Jupiter by referencing the ID number on each garment.

> **ANSWER:    Cintas is without sufficient information to admit or deny the allegations of paragraph 67 of Jupiter's counterclaim and therefore, denies the allegations of paragraph 67 of Jupiter's counterclaim.**

68.    Pursuant to the Hammond Agreement, the garments Cintas' demanded that Jupiter "buy back" are the property of and owned by Cintas.

> **ANSWER:    Cintas admits the allegations of paragraph 68 of Jupiter's counterclaim.**

69.    By October 2019, Jupiter had rented uniforms from Cintas for over 11 years, such that it was conceivable that some uniforms which Jupiter had been renting and which Cintas owned were more than 11 years old.

> **ANSWER:    Cintas admits that by October, 2019, Jupiter had rented uniforms from Cintas for over 11 years, but is without sufficient information to admit or deny the remaining allegations of paragraph 69 of Jupiter's counterclaim.**

70.     Despite Jupiter's multiple requests for information in late October and early November 2019, Cintas refused to provide a purchase date for each pant and jacket which Cintas owned and which Jupiter had rented, for which Cintas now wanted Jupiter to pay to buy a new jacket and pant, even though such information could be easily determined by Cintas.

**ANSWER:     Cintas denies the allegations of paragraph 70 of Jupiter's counterclaim.**

71.     At that time, Cintas also refused to provide an inventory of uniforms to support its demand for $672,974.30 to "buy back" the uniforms.

**ANSWER:     Cintas denies the allegations of paragraph 71 of Jupiter's counterclaim.**

72.     In an email to Jupiter dated November 4, 2019, Cintas' Hammond General Manager Jason Rieger again refused to provide purchase dates or an inventory, but the "buy back" demand now increased $676,365.87.

**ANSWER:     Cintas admits that Cintas' Hammond General Manager Jason Rieger sent an email on November 4, 2019, the content of which speaks for itself and denies the remaining allegations of paragraph 72 of Jupiter's counterclaim.**

73.     On or about December 12, 2019, without explanation, Cintas revised its "buy back" price down to $636,140.13. Cintas still refused to provide a purchase date for each pant and jacket it demanded that Jupiter "buy back."

**ANSWER:     Cintas denies the allegations of paragraph 73 of Jupiter's counterclaim.**

74.     During this time, Jupiter's audit of invoices discovered that Cintas had repeatedly and egregiously engaged in a scheme to charge Jupiter for rental services far in excess of the price increases agreed upon in the Hammond Agreement.

**ANSWER:     Cintas denies the allegations of paragraph 74 of Jupiter's counterclaim.**

18

75.     Jupiter discovered that Cintas had issued it false invoices dating to at least 2014 and likely well before that date.

**ANSWER:     Cintas denies the allegations of paragraph 75 of Jupiter's counterclaim.**

76.     Jupiter discovered that Cintas had concealed the amount of its price increases by failing to clearly and expressly identify the price increase calculation when imposed.

**ANSWER:     Cintas denies the allegations of paragraph 76 of Jupiter's counterclaim.**

77.     Pursuant to the price increases authorized by the Hammond Agreement, the Vinex Fire Resistant Jacket that Jupiter first rented for $1.00 per week in 2008, increasing annually according to the increases in the Consumer Price Index, would have cost $1.17 per week in 2019. Even if increased at five percent annually, that jacket would have cost $1.55 per week in 2019.

**ANSWER:     Cintas denies the allegations of paragraph 77 of Jupiter's counterclaim.**

78.     Based on Cintas' scheme to repeatedly overcharge Jupiter over several years in violation of the Hammond Agreement, in 2019, Cintas charged Jupiter $1.979 per week to rent that jacket.

**ANSWER:     Cintas denies the allegations of paragraph 78 of Jupiter's counterclaim.**

79.     By 2019, due to its scheme over several years, Cintas charged Jupiter nearly seventy percent more, per jacket, per week, than authorized by the Hammond Agreement.

**ANSWER:     Cintas denies the allegations of paragraph 79 of Jupiter's counterclaim.**

80.     When Jupiter discovered Cintas' scheme, Jupiter requested copies of Cintas' invoices to justify the amounts charged to Jupiter since 2008. [Email correspondence between Jupiter and Cintas is attached hereto as Exhibit 3.]

19

> **ANSWER:** **Cintas admits that a Jupiter representative sent an email on or about January 31, 2020 which is attached as Exhibit 3 to the counterclaim the content of which speaks for itself and denies the remaining allegations of paragraph 80 of Jupiter's counterclaim.**

81.     Cintas was unable and/or unwilling to provide the requested invoices.

> **ANSWER:** **Cintas denies the allegations of paragraph 81 of Jupiter's counterclaim.**

82.     Cintas was unable and/or unwilling to provide any paperwork to justify the amounts charged to Jupiter dating to 2008.

> **ANSWER:** **Cintas denies the allegations of paragraph 82 of Jupiter's counterclaim.**

83.     On January 31, 2020, Jupiter rejected ten (10) invoices issued by Cintas between August 2019 and November 2019 because the amounts claimed to be due were incorrect. [Ex. 3.]

> **ANSWER:** **Cintas admits that a Jupiter representative sent an email on or about January 31, 2020 which is attached as Exhibit 3 to the counterclaim the content of which speaks for itself and denies the remaining allegations of paragraph 83 of Jupiter's counterclaim.**

84.     The ten (10) invoices rejected by Jupiter were issued: (1) August 21, 2019; (2) August 28, 2019; (3) September 5, 2019; (4) September 11, 2019; (5) October 2, 2019; (6) October 9, 2019; (7) October 16, 2019; (8) October 23, 2019; (9) October 30, 2019; and (10) November 6, 2019.

> **ANSWER:** **Cintas admits that a Jupiter representative sent an email on or about January 31, 2020 which is attached as Exhibit 3 to the counterclaim the content of which speaks for itself and denies the remaining allegations of paragraph 84 of Jupiter's counterclaim.**

85.     On January 31, 2020, Jupiter informed Cintas that Jupiter had discovered that Cintas had repeatedly and improperly overcharged Jupiter for uniform rentals and cleanings for years, far in excess of the fees authorized by the Hammond Agreement. [Ex. 3.]

**ANSWER:     Cintas admits that a Jupiter representative sent an email on or about January 31, 2020 which is attached as Exhibit 3 to the counterclaim the content of which speaks for itself and denies the remaining allegations of paragraph 85 of Jupiter's counterclaim.**

86.     On January 31, 2020, Jupiter informed Cintas that due to Cintas' improper overcharges for several years, Jupiter does not owe Cintas any further amounts for goods and services, but rather is actually owed a refund of several hundred thousand dollars.

**ANSWER:     Cintas admits that a Jupiter representative sent an email on or about January 31, 2020 which is attached as Exhibit 3 to the counterclaim the content of which speaks for itself and denies the remaining allegations of paragraph 86 of Jupiter's counterclaim.**

87.     Based on initial calculations of Cintas' scheme to overcharge Jupiter dating to at least 2014, Jupiter is owed more than $500,000 in refunds of overpayments.

**ANSWER:     Cintas denies the allegations of paragraph 87 of Jupiter's counterclaim.**

88.     Jupiter also discovered billing discrepancies related to the Beech Bottom Agreement.

**ANSWER:     Cintas denies the allegations of paragraph 88 of Jupiter's counterclaim.**

89.     Due to this fraudulent scheme, Jupiter determined it could no longer work with Cintas and terminated the Hammond Agreement and Beech Bottom Agreement, for cause.

**ANSWER:     Cintas denies the allegations of paragraph 89 of Jupiter's counterclaim.**

90.     Jupiter terminated the Hammond Agreement on October 21, 2019, for cause, shortly after discovering Cintas' fraudulent scheme and while continuing to investigate.

> **ANSWER:**   **Cintas admits Jupiter terminated the Hammond Agreement on or about October 21, 2019, but denies the remaining allegations of paragraph 90 of Jupiter's counterclaim.**

91.     Jupiter terminated that Beech Bottom Agreement on April 23, 2020, for cause, due to Cintas' fraudulent scheme.

> **ANSWER:**   **Cintas admits that Jupiter terminated the Beech Bottom Agreement on or about April 23, 2020, but denies the remaining allegations of paragraph 91 of Jupiter's counterclaim.**

92.     Rather than investigate Jupiter's termination for cause, Cintas decided to file a lawsuit, claiming that pursuant to the Hammond Agreement, Jupiter owes it $98,010.90 for the rejected "past due" invoices and the Hammond Termination Fee, totaling $636,140.13 to buy back the used flame resistant uniforms which Cintas owns.

> **ANSWER:**   **Cintas denies the allegations of paragraph 92 of Jupiter's counterclaim.**

93.     Rather than investigate Jupiter's termination for cause, Cintas sent a demand letter, claiming that pursuant to the Beech Bottom Agreement, Jupiter owes it the Beech Bottom Termination Fee, totaling $84,697.93.

> **ANSWER:**   **Cintas denies the allegations of paragraph 93 of Jupiter's counterclaim.**

## COUNT I
## DECLARATORY JUDGMENT
### (Hammond Agreement)

94.     For Paragraph 94, Jupiter reasserts and realleges Paragraphs 1 through 93 as if fully stated herein.

**ANSWER:**    **Cintas re-alleges as though specifically stated herein, its answers to the allegations contained in paragraphs 1 through 93 of Jupiter's counterclaim as its answer to and for paragraph 94 of Jupiter's counterclaim.**

95.    An actual controversy exists with respect to Jupiter's and Cintas' rights and obligations subsequent to the termination of the Hammond Agreement.

**ANSWER:**    **Cintas admits the allegations of paragraph 95 of Jupiter's counterclaim.**

96.    Jupiter terminated the Hammond Agreement for cause on or about October 21, 2019, after discovering Cintas' long-running scheme to overcharge Jupiter for uniform rental services.

**ANSWER:**    **Cintas admits that Jupiter terminated the Hammond Agreement on October 21, 2019 but denies the remaining allegations of paragraph 96 of Jupiter's counterclaim.**

97.    In the alternative, Jupiter terminated the Hammond Agreement on or about July 8, 2013 for cause, due to documented quality of service reasons which were not cured, and did not reaffirm the Hammond Agreement. Cintas offered a new binding service agreement in 2015 because, per its admission, the Hammond Agreement had "expired" but no new agreement was made.

**ANSWER:**    **Cintas denies the allegations of paragraph 97 of Jupiter's counterclaim.**

98.    Based upon Jupiter's termination of the Hammond Agreement for cause, Jupiter is not required to pay the Hammond Termination Fee to "buy back" any non-standard products it rented from Cintas at "then current replacement values."

**ANSWER:**    **Cintas denies the allegations of paragraph 98 of Jupiter's counterclaim.**

99.    The Hammond Termination Fee, encompassing form language in the Hammond Agreement pursuant to which Cintas purportedly demanded that Jupiter "buy back" used, standard rental uniforms owned by Cintas, operates as an unenforceable penalty.

**ANSWER:    Cintas denies the allegations of paragraph 99 of Jupiter's counterclaim.**

100.    Based upon Jupiter's termination of the Hammond Agreement for cause, Jupiter has no further obligations pursuant to the Hammond Agreement.

**ANSWER:    Cintas denies the allegation of paragraph 100 of Jupiter's counterclaim.**

## COUNT II
## DECLARATORY JUDGMENT
### (Beech Bottom Agreement)

101.    For Paragraph 101, Jupiter reasserts and realleges Paragraphs 1 through 93 as if fully stated herein.

**ANSWER:    Cintas re-alleges as though specifically stated herein, its answers to the allegations contained in paragraphs 1 through 93 of Jupiter's counterclaim as its answer to and for paragraph 101 of Jupiter's counterclaim.**

102.    An actual controversy exists with respect to Jupiter's and Cintas' rights and obligations subsequent to the termination of the Beech Bottom Agreement.

**ANSWER:    Cintas admits the allegations of paragraph 102 of Jupiter's counterclaim.**

103.    Jupiter terminated the Beech Bottom Agreement for cause after discovering Cintas' long-running scheme to overcharge Jupiter for uniform rental services.

**ANSWER:    Cintas admits that Jupiter terminated the Beech Bottom Agreement but denies the remaining allegations of paragraph 103 of Jupiter's counterclaim.**

104.    Based upon Jupiter's termination of the Beech Bottom Agreement for cause, Jupiter

is not required to pay the Beech Bottom Termination Fee.

> **ANSWER:    Cintas denies the allegations of paragraph 104 of Jupiter's counterclaim.**

105.    The Beech Bottom Termination Fee, encompassing form language in the Beech

Bottom Agreement pursuant to which Cintas purportedly demanded payment upon termination,

operates as an unenforceable penalty.

> **ANSWER:    Cintas denies the allegations of paragraph 105 of Jupiter's counterclaim.**

106.    Based upon Jupiter's termination of the Beech Bottom Agreement for cause, Jupiter

has no further obligations pursuant to the Beech Bottom Agreement.

> **ANSWER:    Cintas denies the allegations of paragraph 106 of Jupiter's counterclaim.**

**COUNT III**
**BREACH OF CONTRACT**
**(Hammond Agreement)**

107.    For Paragraph 107, Jupiter reasserts and realleges Paragraphs 1 through 93 as if

fully stated herein.

> **ANSWER:    Cintas re-alleges as though specifically stated herein, its answers to the allegations contained in paragraphs 1 through 93 of Jupiter's counterclaim as its answer to and for paragraph 107 of Jupiter's counterclaim.**

108.    The Hammond Agreement was a valid and enforceable contract, from its execution

on February 4, 2008 through its termination on or about October 21, 2019.

> **ANSWER:    Cintas admits the allegations of paragraph 108 of Jupiter's counterclaim.**

25

109.    For adequate consideration, including payment of invoices, Cintas agreed to abide by the terms of the Hammond Agreement, including to issue accurate invoices correctly reflecting the agreed upon rental and service charges, including with correct annual increases.

> **ANSWER:**    **Cintas admits that Jupiter and Cintas entered into the Hammond Agreement which is attached to Jupiter's counterclaim as Exhibit 1 the terms and conditions of which speak for themselves but denies the remaining allegations of paragraph 109 of Jupiter's counterclaim.**

110.    For adequate consideration, including payment of invoices, Cintas agreed to abide by the terms of the Hammond Agreement, including to issue accurate invoices correctly reflecting the agreed upon number of uniforms that Jupiter agreed to rent per employee.

> **ANSWER:**    **Cintas admits that Jupiter and Cintas entered into the Hammond Agreement which is attached to Jupiter's counterclaim as Exhibit 1 the terms and conditions of which speak for themselves but denies the remaining allegations of paragraph 110 of Jupiter's counterclaim.**

111.    For adequate consideration, including payment of invoices, Cintas agreed to abide by the terms of the Hammond Agreement, including to issue accurate invoices correctly reflecting only the current employees of Jupiter for whom rental uniforms were currently being provided.

> **ANSWER:**    **Cintas admits that Jupiter and Cintas entered into the Hammond Agreement which is attached to Jupiter's counterclaim as Exhibit 1 the terms and conditions of which speak for themselves but denies the remaining allegations of paragraph 111 of Jupiter's counterclaim.**

112.    Jupiter fully performed its obligations under the Hammond Agreement.

> **ANSWER:**    **Cintas denies the allegations of paragraph 112 of Jupiter's counterclaim.**

113.    Cintas breached the Hammond Agreement by committing gross negligence in its provision of flame resistant uniforms to Jupiter.

**ANSWER:** **Cintas denies the allegations of paragraph 113 of Jupiter's counterclaim.**

114.    Cintas breached the Hammond Agreement by issuing inaccurate invoices to Jupiter.

**ANSWER:** **Cintas denies the allegations of paragraph 114 of Jupiter's counterclaim.**

115.    Cintas breached the Hammond Agreement by charging more for uniform rental services than agreed upon in the Hammond Agreement.

**ANSWER:** **Cintas denies the allegations of paragraph 115 of Jupiter's counterclaim.**

116.    Cintas breached the Hammond Agreement by increasing the price of uniform rental services on each anniversary by an amount greater than permitted by the Hammond Agreement.

**ANSWER:** **Cintas denies the allegations of paragraph 116 of Jupiter's counterclaim.**

117.    Cintas breached the Hammond Agreement by failing to openly and conspicuously identify the amount of the annual uniform rental service price increase on the invoices issued to Jupiter.

**ANSWER:** **Cintas denies the allegations of paragraph 117 of Jupiter's counterclaim.**

118.    Cintas breached the Hammond Agreement by charging Jupiter for more uniforms per person than Jupiter agreed to rent from Cintas.

**ANSWER:** **Cintas denies the allegations of paragraph 118 of Jupiter's counterclaim.**

119.    Cintas breached the Hammond Agreement by charging Jupiter for uniforms categorized as "lost" which were not actually lost.

> **ANSWER:    Cintas denies the allegations of paragraph 119 of Jupiter's counterclaim.**

120.    Cintas breached the Hammond Agreement by charging Jupiter to rent uniforms for terminated employees.

> **ANSWER:    Cintas denies the allegations of paragraph 120 of Jupiter's counterclaim.**

121.    As a direct and proximate result of Cintas' breach of the Hammond Agreement, Jupiter has overpaid Cintas for uniform rental services in an amount exceeding $500,000.

> **ANSWER:    Cintas denies the allegations of paragraph 121 of Jupiter's counterclaim.**

## COUNT IV
## FRAUD

122.    For Paragraph 122, Jupiter reasserts and realleges Paragraphs 1 through 93 as if fully stated herein.

> **ANSWER:    Cintas re-alleges as though specifically stated herein, its answers to the allegations contained in paragraphs 1 through 93 of Jupiter's counterclaim as its answer to and for paragraph 122 of Jupiter's counterclaim.**

123.    From at least 2014 through November 2019, Cintas engaged in an intentional and deliberate scheme to make false statements of material fact to Jupiter on a regular basis through the issuance of false invoices to Jupiter.

> **ANSWER:    Cintas denies the allegations of paragraph 123 of Jupiter's counterclaim.**

124.    Cintas knew that its invoices contained false statements of material fact.

**ANSWER:    Cintas denies the allegations of paragraph 124 of Jupiter's counterclaim.**

125.    Cintas intended that Jupiter rely on the false statements of material fact contained in the invoices.

**ANSWER:    Cintas denies the allegations of paragraph 125 of Jupiter's counterclaim.**

126.    Jupiter reasonably relied on Cintas' false statements of material fact contained in the invoices.

**ANSWER:    Cintas denies the allegations of paragraph 126 of Jupiter's counterclaim.**

127.    Cintas' false statements of material fact proximately caused Jupiter to overpay Cintas for uniform rental services in an amount exceeding $500,000.

**ANSWER:    Cintas denies the allegations of paragraph 127 of Jupiter's counterclaim.**

WHEREFORE, the Plaintiff/Counter-Defendant, Cintas Corporation, prays that judgment be entered in its favor, and against the Defendants/Counter-plaintiff, Jupiter Aluminum Corporation, in an amount sufficient to compensate them for the damages and losses it has sustained, for its costs and attorney's fees laid out and expended herein, and for all other relief that may be just and appropriate in the premises.

## AFFIRMATIVE DEFENSES

**First Affirmative Defense**

Jupiter's counterclaims are barred by the doctrine of laches**.**

**Second Affirmative Defense**

Jupiter's counterclaims are barred by the doctrine of waiver.

**Third Affirmative Defense**

Jupiter's counterclaims are barred by estoppel.

**Fourth Affirmative Defense**

Jupiter failed to mitigate its damages.

**Fifth Affirmative Defense**

Jupiter's counterclaims are barred by the statute of limitations.

**Sixth Affirmative Defense**

Venue is improper for Jupiter's claims related to the Beech Bottom Agreement.

Respectfully submitted,

**EICHHORN & EICHHORN, LLP**

By: /s/ David J. Beach_____
        David J. Beach, #18531-45
        Ryan A. Cook, #26798-49
        Attorneys    for    Plaintiff/Counter
        Defendant, Cintas Corporation

**EICHHORN & EICHHORN, LLP**
2929 Carlson Drive, Suite 100
Hammond, IN 46323
Telephone No.: (219) 931-0560

## CINTAS'S COUNTERCLAIM TO JUPITER'S COUNTERCLAIM

1.      Cintas maintains a facility at 40 Abele Rd, Bridgeville, PA 15017 ("Cintas No. 13" herein).

2.      Jupiter maintains a facility at 8963 River Rd., Wheeling, West Virginia, 26070 ("Jupiter Wheeling" herein).

3.      On or about September 26, 2013, Cintas No. 13 and Jupiter Wheeling entered into a Standard Rental Service Agreement (the "Beech Bottom Agreement").

4.      A true and complete copy of the Beech Bottom Agreement is attached hereto as Exhibit 3.

5.      The Beech Bottom Agreement was signed by an authorized representative of Jupiter Wheeling.

6.      The Beech Bottom Agreement was signed by an authorized representative of Cintas No. 13.

7.      The Beech Bottom Agreement was a valid and enforceable contract.

8.      The Beech Bottom Agreement is a separate and independent contract from the Hammond Agreement.

9.      Under the terms of the Beech Bottom Agreement, Cintas No. 13 agreed to rent certain garments to Jupiter Wheeling.

10.     Under the terms of the Beech Bottom Agreement, Jupiter Wheeling agreed to pay Cintas No. 13 certain enumerated weekly rental fees for the garments.

11.     Under the terms of the Beech Bottom Agreement, Jupiter Wheeling agreed to pay Cintas No. 13 certain other specified charges.

12.     Under its terms, the Beech Bottom Agreement remained in effect for 60 months from the date of installation.

13.     Under its terms, the Beech Bottom Agreement automatically renewed for an additional 60 month term unless Jupiter Wheeling notified Cintas No. 13 to the contrary in writing 60 days in advance of the expiration of the then current term.

14.     Jupiter Wheeling did not notify Cintas No. 13 of an intent to cancel the Beech Bottom Agreement in writing 60 days in advance of the expiration of the original term.

15.     Under its terms, the Beech Bottom Agreement renewed for an additional 60-month term on September 26, 2018.

16.     If Jupiter Wheeling terminated the Beach Bottom Agreement early for any reason other than documented quality of services issues, Cintas No. 13 is entitled to liquidated damages.

17.     Cintas No. 13 made significant investments in the service items provided to Jupiter Wheeling.

18.     In September, 2019, Jupiter Wheeling notified Cintas No. 13 of its desire to discontinue service with Cintas and use Aramark for its rental program.

19.     Jupiter Wheeling did not raise or otherwise document any quality of services issues at the time it notified Cintas of its desire to discontinue service.

20.     Cintas No. 13 notified Jupiter Wheeling in writing that it remained under an active contract, the Beech Bottom Agreement, and of the costs that would be due and owing to Cintas No. 13 in the event Jupiter Wheeling proceeded with termination of the Beech Bottom Agreement.

21.     Counsel for Cintas No. 13 sent correspondence to Jupiter Wheeling on or about September 16, 2019, notifying Jupiter Wheeling that its termination constituted a breach of the Beech Bottom Agreement and reminding Jupiter Wheeling of its obligations under the Beech

Bottom Agreement, including the obligation to pay liquidated damages if it proceeded with early termination.  A true and correct copy of the September 16, 2019 correspondence is attached hereto as Exhibit 4.

22.     Jupiter Wheeling received the September 16, 2019 correspondence.

23.     Thereafter, Jupiter Wheeling made the decision to continue service with Cintas No. 13 under the Beech Bottom Agreement.

24.     On or about April 23, 2020, without prior notice, Jupiter Wheeling advised Cintas No. 13 it was terminating the Beech Bottom Agreement effective immediately.  A true and correct copy of Jupiter Wheeling's April 23, 2020 correspondence is attached hereto as Exhibit 5.

25.     Jupiter Wheeling's April 23, 2020 notice of termination did not provide Cintas No. 13 with 60 days' notice of its intent to cancel the Beech Bottom Agreement.

26.     Jupiter Wheeling's April 23, 2020 notice of termination did not raise or otherwise document any quality of services issues to Cintas No. 13 regarding the services provided by Cintas No. 13 under the Beech Bottom Agreement.

27.     Jupiter Wheeling's April 23, 2020 termination terminated the Beech Bottom Agreement before the expiration of its then current 60-month term.

28.     On or about April 28, 2020, counsel for Cintas No. 13 sent a letter to Jupiter which notified Jupiter that Jupiter Wheeling had past due invoices with a total balance of $6,900.34.  A true and correct copy of the letter is attached here as Exhibit 6.

29.     The April 28, 2020 letter notified Jupiter that Jupiter Wheeling was in breach of the Beech Bottom Agreement.

30.     Jupiter Wheeling breached the Beech Bottom Agreement.

31.     Under its terms, if Jupiter Wheeling terminated the Beech Bottom Agreement before the expiration of its term, Jupiter Wheeling agreed to pay Cintas No. 13 as liquidated damages, and not as a penalty, the greater of 50% of the average weekly invoice total multiplied by the number of weeks remaining in the unexpired term, or buy back all garments and other products allocated to Jupiter Wheeling at the then current replacement values.

32.     The April 28, 2020 letter notified Jupiter Wheeling that 178.57 weeks remained of the current term of the Beech Bottom Agreement.

33.     The April 28, 2020 letter notified Jupiter Wheeling that its average weekly volume was $871.33.

34.     The April 28, 2020 letter notified Jupiter Wheeling that the liquidated damages due and owing as a result of its early termination of the Beech Bottom Agreement were $77,797.59.

35.     The April 28, 2020 letter notified Jupiter that Cintas No. 13 was formally and finally demanding payment of $84,697.93 to Cintas no later than Friday, May 1, 2020.

36.     Jupiter did not make payment of $84,697.93 to Cintas on or before May 1, 2020.

37.     To date, Jupiter has not paid $84,697.93 to Cintas.

## Count I
## Breach of Beech Bottom Agreement

38.     Cintas re-states paragraphs 1 through 37 above as if set forth in full herein.

39.     The Beech Bottom Agreement between Cintas No. 13 and Jupiter Wheeling is a contract.

40.     The Beech Bottom Agreement between Cintas No. 13 and Jupiter Wheeling is valid.

41.     The Beech Bottom Agreement between Cintas No. 13 and Jupiter Wheeling is enforceable.

42.     The Beech Bottom Agreement required Cintas No. 13 to provide garment services to Jupiter Wheeling.

43.     Cintas No. 13 provided garment services to Jupiter Wheeling.

44.     Cintas No. 13 performed its contractual obligations by providing garment services to Jupiter Wheeling.

45.     Jupiter Wheeling materially breached the Beech Bottom Agreement by providing less than 180 days' notice of its intent to terminate the contract.

46.     Jupiter Wheeling materially breached the Beech Bottom Agreement by terminating it in advance of the expiration of the then current term.

47.     Jupiter Wheeling materially breached the Beech Bottom Agreement when it failed and refused to pay for the garment services it received from Cintas No. 13.

48.     Jupiter Wheeling materially breached the Beech Bottom Agreement by failing to pay liquidated damages for its early termination of the Beech Bottom Agreement.

49.     Cintas No. 13 materially performed its obligations under the Beech Bottom Agreement.

50.     Due to Jupiter Wheeling's material breach of the Beech Bottom Agreement, Cintas No. 13 has sustained damages.

## Count II

### Quantum Meruit (Contract Implied-in-Fact)

51.     Cintas No. 13 re-states paragraph 1 through 51 above as if set forth in full herein.

52.     Jupiter Wheeling requested garment services from Cintas No. 13.

53.     Jupiter received garment services from Cintas No. 13.

54.     Cintas No. 13 purchased and provided garments specifically for Jupiter Wheeling's use.

55.     Jupiter Wheeling used the garments purchased and provided by Cintas No. 13.

56.     Jupiter made some payments to Cintas No. 13 for the garment services it received.

57.     The actions of the parties constitute a contract implied-in-fact.

58.     Jupiter Wheeling breached the contract implied-in-fact when it failed and refused to pay for garment services it received from Cintas No. 13.

59.     Jupiter Wheeling breached the contract implied-in-fact when it terminated the agreement on April 23, 2020 without notice.

60.     On or about April 28, 2020, Cintas No. 13 made demand on Jupiter Wheeling for past due invoices and payment for damages caused to Cintas No. 13 by Jupiter Wheeling's breach of the contract implied-in-fact.

61.     Jupiter Wheeling has not paid the amounts demanded by Cintas No. 13.

62.     Cintas No. 13 has been damaged by Jupiter Wheeling's breach of the contract implied-in-fact.

63.     Jupiter Wheeling has been unjustly enriched by its failure to pay Cintas the amounts demanded.

**Count III**

**Quantum Meruit (Contract Implied-in-Law)**

64.     Cintas No. 13 restates paragraph 1 through 55 above as if set forth in full herein.

65.     Jupiter Wheeling requested garment services from Cintas No. 13.

66.     Jupiter Wheeling received garment services from Cintas No. 13.

36

67.     Cintas No. 13 purchased and provided garments specifically for Jupiter Wheeling's use.

68.     Jupiter Wheeling used the garment services provided by Cintas No. 13.

69.     Jupiter Wheeling made some payments to Cintas for the garment services it received from Cintas No. 13.

70.     The actions of the parties constitute a contract implied-in-law.

71.     On or about April 28, 2020, Cintas No. 13 made demand on Jupiter Wheeling for past due invoice amounts and damages it incurred as a consequence of Jupiter Wheeling's termination of the contract implied-in-law.

72.     Jupiter Wheeling has not paid the amounts demanded by Cintas No. 13.

73.     Cintas No. 13 has been damaged by Jupiter Wheeling's breach of the contract implied-in-law.

74.     Jupiter Wheeling has been unjustly enriched by its failure to pay Cintas the amounts demanded.

**WHEREFORE,** the plaintiff/counter-defendant, Cintas Corporation, for its counterclaim to the counterclaim of Jupiter Aluminum Corporation prays that it be awarded judgment in its favor, and against the defendant, Jupiter Aluminum Corporation, for the following relief:

(a) an amount sufficient to compensate it for its damages and losses from Jupiter Wheeling's breach of the Beech Bottom Agreement;

(b) compensation for the benefits improperly conferred on Jupiter Wheeling as a result of its wrongful conduct, lest it be unjustly enriched;

(c) pre-judgment interest;

37

(d) its costs and expenses laid out and expended herein, including its attorney's fees and costs of collection; and

(e) all other relief appropriate in the premises.

Respectfully submitted,

**EICHHORN & EICHHORN, LLP**

By: /s/ David J. Beach_____
        David J. Beach, #18531-45
        Ryan A. Cook, #26798-49
        Attorneys    for    Plaintiff/Counter-
        Defendant, Cintas Corporation

**EICHHORN & EICHHORN, LLP**
2929 Carlson Drive, Suite 100
Hammond, IN 46323
Telephone No.: (219) 931-0560

## CERTIFICATE OF SERVICE

I, David J. Beach, certify that on the 23rd day of June, 2020, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such

filing to the following:

> Blake A. Roter
> Burke Warren MacKay & Serritella, PC
> 330 North Wabash Avenue
> Suite 2100
> Chicago, Illinois 60611
> broter@burkelaw.com
>
> Robert F. Parker
> Burke, Costanza & Carberry, LLC
> 9191 Broadway
> Merrillville, IN 46410
> parker@bcclegal.com

> /s/ David J. Beach
> David J. Beach